May it please the Court, Attorney Dennis Aoife for the Petitioner, Wang Dong. Basically, Your Honor, this case comes down to two issues. There's a credibility issue and there's also a past persecution issue. Okay, if you could speak up. With respect to the credibility issue, Your Honor, the Board focused on two issues, which I would argue both are trivial. One is that the Petitioner testified that the arrest took place in the morning, but it was actually in the afternoon according to the declaration. And the Ninth Circuit has held many, many times that inability to recall precise dates or hours in this case would be, has no bearing and degree of past persecution. And obviously, he was not trying to enhance his claim. Either way, it happened morning or afternoon, and I would add it took place six years after the hearing took place. But isn't it an accumulation of inconsistencies, not just one in particular? Well, yeah, but they really only pointed out two, Your Honor. There was this one with regard to the 7 a.m., 7 p.m., and the other one is whether he was expelled from middle school or from high school. And again, that does not enhance his persecution in any way. Either way, it was in this case. There was yet a third, and the question is whether it was on Friday or Saturday. Actually, Friday or Sunday. Yes, but the Board didn't highlight that one, although, yes, the judge did point that out. And again, I would submit that that falls under the Wren type of cases, Your Honor. In Wren, the Petitioner said the wrong date on which he was beaten. He was beaten on the second day, and the declaration said third day. And the court said, well, victims of abuse often make such mistakes, and they said, minor discrepancies in dates that cannot be viewed as attempts by the applicant to enhance his claims of persecution have no bearing. Credibility, ability to recall precise dates of events years after they happen is an extremely poor test of how truthful a witness's substantive account is. So I would argue that in totality of the circumstances, all three of the mistakes are minor. Now, if we were to hold that the adverse credibility finding was incorrectly entered and so that we would deem the testimony credible, we then end up with a Ventura problem because, at least as I look at it, the ill treatment to which he was subjected was not very severe. He testified that he was slapped and that the officer then held his baton out toward his nose and told him something bad would happen if he continued to meet in an unauthorized church. That's it. That's right, Your Honor. That does not strike me as – now, I can't – I'm not in a position to hold that because of Ventura. Yes. But even if you win on the credibility, it's going to go back to the agency to say, I'm pretty confident in predicting what they'll say, that this doesn't rise to the level of persecution. They already found that in this case, Your Honor. Oh, did they? I'm sorry. I missed that. No, they found no past persecution also. What I would argue, Your Honor, and I would urge the court to focus on the accumulation of everything because he does have some other harm that he testified to before, and that is his mother was forced to have an abortion and he observed it when he was just nine years old. Observed it, meaning he observed her being taken away. That's right. How do you – that's in the record, but it's also in the record where he said when he was asked, or maybe he volunteered, he's not certain how that made him feel at the time. How do we read that? He said – Are we second-guessing the – I understand. He said all that, but he also said in concluding that I don't know now how I really felt at that time. Right. Even at the time the testimony took place, this was a very young man. I mean, the gentleman is only 19 years old when the testimony took place, and he was only 17 years old when he was arrested, and I'd like the court to consider that part, too, because in Zang v. Gonzalez, this court has found that age is a really big factor in considering persecution, and it bears on the question whether he was persecuted or has a well-founded fear, and he was nine years old when his mother was dragged out of his home, and after that she was unable to work anymore, although we don't know if that's connected, and perhaps the case could be remanded for that purpose. The one other thing I would like the court to consider is that he was unable to continue to practice Christianity after this. Now, he doesn't say that he was expressly forbidden, but he does say that he didn't go after this any longer, and so you could argue that under Guo it was tantamount to prohibiting him because he was afraid of any future arrests, so he didn't go anymore. So perhaps while I would agree that the harm with regard to only Christianity is a bit light, but if we consider everything together, the harm to his mother, which he observed at nine years old, his arrest at 17 years old, the fact that he continues to practice Christianity in the United States and only has to show a 10% chance of harm if he were to return to China, I would argue compels a finding of best persecution. The saying was interesting because it seemed to have more what I would call disturbing facts. That's true. Which led to a reversal. I would agree with the court on that. There was more testimony that the father couldn't work anymore and that she couldn't go to school. That petitioner, however, I did forget to mention this, if the court finds him to be credible, then he was expelled from school and he was unable to continue and finish his education, which is another factor as far as best persecution. But the family didn't suffer any kind of economic deprivations like in? Well, the record wasn't developed further. He testified that his mother did not work after this incident, but nobody questioned him if this was exactly connected to her forced abortion. He just said she didn't go back to work anymore. And in? In? In? In? In? In? In? In? In? In? In? In? In? In? In? I don't know if this was gone into in depth as far as his mother's pregnancy being accidental or not. Okay. Can I reserve the last three minutes? Why don't we hear from the government and then we'll get a chance to respond. Good morning, Your Honors. May it please the Court, Eric Anderson representing the Attorney General. This case, as the petition points out, raises one adverse credibility issue, one claim regarding well-founded fear of persecution in the future, and one claim regarding past persecution. So just taking them in turn, the agency found that he did not credibly testify that he experienced this raid at the house church and expulsion from school. What we know is that when he testified, he was telling his story about he consistently testified about the raw dates. He was baptized on June 11, 2006. On direct testimony, his attorney asked him more details. Where were you in school then? And he said for the first time, I had just graduated middle school. I was in between middle school and high school. At this point, there's questions to elucidate a parent conflict because his written application said he had graduated a full year earlier from junior high school and that he would have had a whole year of high school under his belt. No, I get all this. That is to say, he cannot keep straight whether this happened on what date with respect to his schooling. He cannot keep straight whether it was the morning or the evening. He cannot keep straight whether it's Friday or Sunday. On the other hand, typically when we get false stories, the story is sufficient to support a grant of asylum. The story that he has presented, any competent immigration person, including the people who help would-be immigrants or asylum seekers, make up false stories, knows that this is insufficient. So the fact that he tells a story that is by itself insufficient to qualify him for asylum tells me that this is not very likely to be a lie because if he was going to tell a lie, he would have told a lie that would get him asylum. It's possible, Your Honor. I mean, I see a lot of these cases. And when you get a liar, you get a liar who tells a story that's sufficient to qualify for asylum. Particularly if it's on some, well, you know, we all are told if it's on some particular significant point and that's material in nature. But my concern is the rejection of the documents from people who are trying to corroborate his testimony and the process under which the agency here has to review and determine whether or not it's admissible. You're dealing with a foreign country and you're seeking then to require some type of self-authenticating documents. Help me to understand this. In this case, Your Honor, the agency did not exclude any of his documentation from China. But it excluded in the sense of giving it any credibility because it wasn't authenticated. Well, because we have an individual who has credibility problems and he suddenly comes in with documents from people who can't be cross-examined. We know cross-examination works. I don't understand what you mean, suddenly come in. Don't you expect him to come in with something? Well, Your Honor, in this case, there was a gap. He had hearings on two dates. It was agreed that there was going to be continuance and he was going to come back with more. But the agreement was he was going to come back with more corroboration of his practice of Christianity. But he also produced the additional documents concerning the expulsion from school and that raid in September 2006. He provided almost no testimony about those documents. And when you're looking to consider what has been credibly established, well, we know here that cross-examination works because of the problems it points out. How can you rely on an out-of-court document? It doesn't compel a finding that we now suddenly know that this raid occurred. So there would have been a different result had it been authenticated in some way? If it had more reason for the agency to give it greater weight, the agency might have given it a different outcome. In this case, they decided what was presented to them. And what would have constituted authentication? I mean, I see a lot of these cases, of course. And occasionally the government will send somebody to a foreign country and try and locate the hospital that's alleged to have treated the person and so on. But usually that does not happen. And usually when you look at the documents that we have, there's some sort of half-hearted attempt to show that if you have the original envelope, that helps show us, you know, and so on. But typically the documents just come in and they are what they are. Given the way they're due, yes. And the documents that come in are consistent with his having been expelled. The only issue is when. And does the government contend that because he's unclear as to when, that he wasn't expelled at all? You didn't credibly establish that he was expelled, yes, Your Honor. We have a document. He's now relying on a document that says he was a student of the first year of high school. Does this corroborate his testimony that he never went to high school, that he went to high school for one year or that he was at the beginning of his second year of high school? Well, no, but the question is not that. It really doesn't matter for purposes of his asylum claim when he was expelled. What does matter is whether. So are you saying that his confusion as to dates support substantially the IJ's and then the BIA's conclusion that he was never expelled? Absolutely, Your Honor. They provided specific and cogent reasons found in the record of why he did not credibly establish the expulsion. So in the view of the agency, he quit school voluntarily? I don't know. I mean, he's here. He's not in school. And he's young. So he's not in school. He either was expelled or he quit voluntarily. He stopped going to school after one semester in the United States, which is why he became removable. He was admitted on a student visa. He was here and then voluntarily stopped going to school. People do that. So we've talked about the inconsistencies. We've talked about the documents supported to try to rehabilitate his corroboration or rehabilitate his credibility. I'm sorry, Your Honor. Assuming the credibility finding stands, then what we have is simply a claim that the agency accepted that he practices Christianity in the United States and the conclusion that this does not establish a well-founded fear of persecution in the future in China. Given the State Department report, the agency was well able to reach that conclusion. Counsel? Is Judge Gould, if I could? On that issue, what's your response to the argument that all he has to show on fear of future persecution is that there's a 10 percent chance that his Christianity in the U.S. would result in persecution? The evidence does not compel a reasonable fact finder to find even a 10 percent chance, Your Honor. Given the record evidence that there's between 16 and 90 million Protestants in China and many parts of the country, they are permitted to go to unregistered churches, unmolested. In other parts, there are problems for leaders of house churches, and in other parts there is more aggressive prosecution in general. But these facts don't compel a reasonable fact finder to conclude that he met his burden in this case. Okay, thank you. So finally we come to the issue of the mother's forced abortion when he was nine, which the agency accepted as credible. In Zhang, we've talked about Zhang in the briefs in this case. Zhang has a few holdups. The first is that an alien does not establish he is a refugee by showing that his mother or father was subject to a forced abortion or sterilization in China. The second issue, the second holding in Zhang was about the sensitivity to harm experienced as a child. And in this case, the board cited both Zhang and Hernandez-Ortiz, considered the facts, which were much less aggressive than those in Zhang, and concluded it did not show persecution. Just to turn to the father's employment, in fact, at one point at the very beginning, when he's describing his family, he described his father as a geologist. So there is no evidence that the father was unemployed. There is no evidence of any substantial harm to the family at all. He was able to attend school, and although he claims he was expelled, the agency did not accept that on credibility grounds. What do we know, if anything, about the employment status of the father at the time he leaves China? I'm not sure it's time-specific. At one point, he's just described as a geologist who did tests on the ground. I noticed on the written form that he has checked that both of his parents are deceased. I read that. You know, the asylum officers, when they're doing the interview, they kind of check off things as they say to confirm. I did not think it was checking deceased. I think it was a check to confirm that he answered the same way and did not wish to change his answer there. If you just look at 324, all the things on that page have checks next to them. Hang on a second. Let me do 324. I'm looking at the bottom of 324. It says deceased, so you're trying to give me some explanation to that that I'm not sure I understand yet. There's check marks all over that page. Right, I understand. And as the asylum officer is doing the interview, as he hits a question, these are the marks they make. Right, and you're telling me that the mark that he's made, ticking the box deceased, deceased, doesn't mean that they're deceased? I think it was – I agree it's a little ambiguous, Your Honor. I don't find it ambiguous unless you can persuade me otherwise. What reason should we have to believe that this tick mark doesn't mean what it seems to say? It doesn't mean that he doesn't have a mother. It doesn't mean he doesn't have a father when they're checked through. I mean, it's just he answered that question in the same way, which is that they're currently living. In fact, I'm sorry, Your Honor, after this asylum application was filed, he produced updated letters from the mother and father, so we know they weren't deceased at the time of the asylum application because he later provided letters. So you're telling me that these check marks are made by the asylum officer interviewing and that I should ignore them? Yes, Your Honor. Okay. And I'm sorry to have gone over, but if there's anything else, I'd be glad to answer. Okay. Thank you. Thank you. Your Honor, I just want to address three points that actually the court sort of brought out through their questions. One other factor to consider with respect to past persecution is that the mother was also arrested and detained two days, and the court is allowed to consider harm to relatives that are similarly situated. That's number one. Number two, the court correctly pointed out the board did, for some inexplicable reason, gave almost no weight to the expulsion notice, arguing that it's a photocopy. And as I put in my brief, there's nothing in the record that says he didn't have the original. Nobody asked him, do you have the original, can we see it? So the board's point is perplexing because there is nothing to assume that it's not a legitimate document. And also, with respect to well-founded fear, he did submit some letters from his parents that say the police are looking for him. So that goes to the point that there is a 10% chance of persecution because, unlike Gu, V. Gonzalez, which is the case under which normally this type of a case would wither, the police did not lose interest in him and they continued looking for him. And finally, there is a Ninth Circuit case, Zang v. Ashcroft, that says the applicant should not be prevented from practicing his chosen religion. So even if counsel's right and there are 40 million Christians going to church in China under the government church, that is not the church this petitioner wants to attend. That church is controlled by the communist government. They tell the pastors what to say. They pick the pastors. They answer to the party, not to God. Even though they have the listing of these approved, church-approved churches, including some who are Christian, these so-called home churches, in some areas, the record shows, I think has been pointed out, there is perhaps less tolerance in certain areas of China for those churches.  But the very same report, and I highlighted this in my brief, the very same report says that other individuals engaging in unsanctioned religious activity have been detained and physically abused. So it does vary. In some places, there is some tacit approval, and in other places, they do persecute and harass the members and arrest the members, take their property, things like that. But we don't have any of that here. Well, he did get arrested. They didn't take his property. No, they did not take his property, no. Nor, so far as we can tell, deprive the father of his employment. No, as far as we can tell, the father is still employed. The mother is not working. And do you agree with your adversary that I should ignore those tick marks that say deceased? They do. Yeah, the parents are alive. And as counsel said, when they do the interview, the first thing they do is go through the I-589 one by one and put those little check marks. Now, I don't have it in front of me. Is there a box that says deceased? There's a box that says deceased, and there's a little tick mark going through each one of the two boxes. I guess that means, contrary to what the form appears, that means he asked the question and ignored the answer. Yes, either ignored the answer or just didn't even ask. Didn't even ask and just put check marks. They do that occasionally. But in any event, there's no dispute as to whether or not the parents are deceased. And there's no allegation on the side of the government that he lied about that. That's correct, Your Honor. No, they never brought this issue up. We just don't pay any attention to it. Okay, I got it. Thank you, Your Honor. Okay, I think both sides. Wang v. Lynch submitted for decision.
judges: W. Fletcher, Gould, Lemelle